IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PATRICIA CAMPBELL WELLS          )
                                 )
v.                               )          No. 3:14-1279
                                 )          Judge Trauger/Bryant
SOCIAL SECURITY ADMINISTRATION   )


To:     The Honorable Aleta A. Trauger, District Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under Title II of the Social Security Act.  The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 9), to which defendant has responded (Docket Entry No. 11).  Plaintiff has further filed a reply in support of her motion for judgment.  (Docket Entry No. 12)  Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 7),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED, and that the decision of the SSA be AFFIRMED.


## I.  Introduction

Plaintiff filed her application for disability insurance benefits on January 3,

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

2011, alleging a disability onset date of May 30, 2009, due to lower back disc problems, torn

rotator cuff, right arm tendonitis, and high blood pressure. (Tr. 117, 127, 131) Plaintiff's

claim was denied at the initial and reconsideration stages of state agency review. Plaintiff

subsequently requested *de novo* review of her claim by an Administrative Law Judge (ALJ).

The case came to be heard by the ALJ on October 24, 2012, when plaintiff appeared with

counsel and gave testimony. (Tr. 30-66) Testimony was also received from an impartial

vocational expert. At the conclusion of the hearing, the ALJ took the matter under

advisement until January 11, 2013, when she issued a written decision finding plaintiff not

disabled. (Tr. 14-22) That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security
   Act on March 31, 2011.

2. The claimant did not engage in substantial gainful activity during the period
   from her alleged onset date of May 30, 2009 through the date she was last
   insured for Title II benefits, March 31, 2011 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe
   impairments: degenerative disc disease and right shoulder impingement (20
   CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or
   combination of impairments that met or medically equaled the severity of one
   of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
   404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that
   through the date last insured, the claimant had the residual functional capacity
   to perform light work as defined in 20 CFR 404.1567(b) except for frequent
   pushing and pulling of the right upper extremity, frequent postural activities
   except for occasional climbing ladders, ropes, and scaffolds, and crawling,
   occasional overhead reaching and frequent other reaching of the right upper
   extremity, and avoidance of all exposure to hazards.

6.	Through the date last insured, the claimant was capable of performing past relevant work, which did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.	The claimant was not under a disability, as defined in the Social Security Act, at any time from May 30, 2009, the alleged onset date, through March 31, 2011, the date she was last insured for Title II benefits (20 CFR 404.1520(f)).

8.	The claimant's subjective complaints, including pain, have been evaluated as required under the applicable regulations and rulings.

(Tr. 21-22, 26)

On February 26, 2014, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 6-8), thereby rendering that decision the final decision of the Administration.  This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).  If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive.  Id.

## II.  Review of the Record

The following review of the record is taken from plaintiff's brief, Docket Entry No. 10 at pp. 2-20:

On May 31, 2009, Ms. Wells went to Blanchfield Army Community Hospital (BACH) emergency room complaining of right foot pain radiating up her leg into her hip (Tr. 245). She reported she had slipped that morning and that she had been pushing a cart and slipped on the floor almost falling but caught herself, straining her right leg (Tr. 247). She rated the pain as 6/10. The provider observed mild pain, diagnosed right leg muscle strain, prescribed rest and medicine, expecting improvement in three days (Tr. 248).

On June 3, 2009, Ms. Wells reported at BACH that she had pain in the right leg/hip and lower back, rating the pain as 4/10 on the pain scale (Tr. 490-491). She had run out of the muscle relaxer she had been given in the emergency room and needed refills of that and Motrin (Tr. 491). Both these medications were providing good pain control at that time, but she needed the

pain medication for back flares associated with increased activity (Tr. 491). The family nurse practitioner noted positive bilateral paraspinal muscle spasms at the lumbar area (Tr. 491). She prescribed Flexeril 10 mg., Motrin 800 mg. and Lortab 5/500 every 4 to 6 hours (Tr. 492).

On June 18, 2009, Ms. Wells went to BACH because of lower back pain that she rated as 4/10 on the pain scale (Tr. 486). It was noted that Ms. Wells had been managed conservatively with non-steroidal inflammatory drugs (NSAID's), muscle relaxers and sparse use of Lortab, but Ms. Wells reported pain had not resolved (Tr. 486). Ms. Wells reported that she had recently gone to Disney and walked a lot and the symptoms exacerbated (Tr. 486). The family nurse practitioner noted that the lumbar/lumbosacral spine exhibited abnormalities and the lumbosacral spine exhibited spasms of the paraspinal muscles bilaterally (Tr. 487). A lumbosacral spine series revealed slightly decreased disc space at level of L5-S1 with anterolateral osteophyte formation at the levels of L3, L4 and L5 (Tr. 483). Robaxin was prescribed, with Ms. Wells saying she had an adequate supply of all other medications (Tr. 487). Ms. Wells was referred to physical therapy (Tr. 487). The report claimed that Ms. Wells reported that her fall was at work, but Ms. Wells disputed that statement on August 25, 2009 (Tr. 468, 483).

On July 30, 2009, Ms. Wells reported lower back pain, and stated that she had injured her back on May 30 and had been having pain ever since (Tr. 479). She was prescribed Ibuprofen 500 mg., Flexeril 10 mg. and Lortab 5/500). The assessment was back strain lumbar (Tr. 481).

On August 17, 2009, Ms. Wells had an MRI of her lumbar spine due to her complaints of low back pain and right leg pain (Tr. 1285). This was at the request of the BACH family nurse practitioner (Tr. 1285). She had moderate bilateral facet arthropathy from L2-L3, L3-L4, L4-L5 and L5-S1. She had mild degenerative disk disease and minimal broad-based posterior disk bulge at L2-L3 and moderate degenerative disk disease at L3-L4, L4-L5 and L5-S1. She had mild broad-based posterior disk bulge at L4-L5. She had moderate broad-based posterior disk bulges at L3-L4 and L5-S1 (Tr. 303). The impression was multilevel spondylosis with facet arthritis bilaterally at L5 levels (Tr. 303).

On August 25, 2009, Ms. Wells rated her lower back and right leg pain as 6/10 on the pain scale (Tr. 468). Ms. Wells disputed that she had ever said that her initial injury was a fall at work and stated that she had always stated that the fall occurred at Walmart (Tr. 468). Ms. Wells reported that physical therapy had been unsuccessful and she requested refills of Lortab and Flexeril (Tr. 468). Although reporting that Lortab, Flexeril and Motrin provided good pain control, she agreed to a referral to Neurosurgery and Pain Management (Tr. 468). Ms. Wells was tearful during her exam, stating that the fall at Walmart interfered with her ability to perform activities of daily living (Tr. 468).

On August 26, 2009 Deborah Currey of the White Clinic at BACH asked that Ms. Wells be referred to Pain Associates of Tennessee because Ms. Wells had localized low back pain since her fall at Walmart several months before and Ms. Wells had had no improvement with conservative management, NSAID's, muscle relaxers, and physical therapy (Tr. 406).

On September 28, 2009, Star Therapy discharged Ms. Wells from physical therapy which had started June 29, 2009 (Tr. 1356). She had received instruction in proper posture and body mechanics and was instructed in a home exercise program and had met one other goal (sitting for 30-45 minutes without an increase in pain and for improved tolerance to activities of daily living/work activities in 4 weeks) (Tr. 1356). She had not met other goals, such as being able to sleep 4-6 hours without waking from back/right lower extremity pain and being able to stand sixty minutes without an increase in pain (Tr. 1356). Ms. Wells did not return for treatment, reporting she was being referred to a neurosurgeon (Tr. 1356).

On October 7, 2009, Ms. Wells reported lower hip pain of 6/10 on the pain scale and was given a refill of Lortab and Flexeril (Tr. 460).

On October 8, 2009, Ms. Wells started treatment with Dr. S. Periyanayagam, reporting that she had slipped in a puddle of water at Walmart on May 30, 2009 and had prevented herself from falling on the ground by grabbing onto a cart (Tr. 301, 1280). She had a positive straight leg raising (SLR) test on the right side about 50 degrees (Tr. 302). She had an absent ankle jerk on the right side (Tr. 302). His impressions were bulging disc at L5-S1, right causing lumbar radiculopathy, right, and degenerative lumbar disc disease (Tr. 302). Dr. Periyanayagam advised a lumbar laminectomy and discectomy at L5-S1 if her symptoms persisted (Tr. 302).

On October 28 or 29, 2009, Ms. Wells began treatment at Pain Associates of North Tennessee (PANT), reporting pain in low back and right leg and that she had slipped in May 2009 (Tr. 295). On the pain and medical history form she reported pain in her lower back and down right leg (Tr. 1513). She reported that she slipped in water and to prevent hitting the floor she twisted and jerked very hard (Tr. 1513). She rated her pain as 9-10/10 on the pain scale if she walks more than 10 to 15 minutes and 7/10 on the pain scale otherwise (Tr. 1513). She reported that sitting, standing, lying, walking, bending, lifting and activity made the pain worse and that the pain affected her sleep and she took Lortab mainly to sleep (Tr. 1499, 1514). She reported that heat and standing (rotating position) and doing the physical therapy exercises helped her pain (Tr. 1514). The examination showed tenderness on the left side of the lumbar area and decreased strength in right lower extremity (Tr. 1499-1500). An electrodiagnostic lumbar study of the Class III fibers was conducted (Tr. 1502). It showed impaired conduction in these areas:

Bilateral (L5) peroneal nerve +2 moderate
Right (S1) sural nerve +4 severe
Right (S2) post. femoral cutaneous nerve +2 moderate

The same test found probable irritation in these areas: Right (L1) upper lumbar nerve -1 hyper; and on the left (L2) lat. femoral cutaneous nerve -1 hyper; (L4) saphenous nerve -1 hyper; (S2) post. femoral cutaneous nerve – 1 hyper (Tr. 1502)

The assessment was lumbar spondylosis and an EMPI electrotherapy unit was ordered. (Tr. 1489, 1500).

On November 9, 2009, Ms. Wells reported to BACH that her back pain was 6/10 on the pain scale (Tr. 446). She was prescribed Lortab 7.5/500 and Flexeril, 10 mg. (Tr. 447).

On November 12, 2009, at her PANT appointment, the examination revealed tenderness in the lumbar area and decreased range of motion of lumbar flexion (Tr. 1495). On November 20, 2009, Ms. Wells reported that her lower back pain and right leg pain were 7/10 on the pain scale (Tr. 443). On the November 25, 2009, PANT appointment, Ms. Wells continued to complain that "back hurt" and walking, bending, and sitting a long period made her pain worse (Tr. 1492). The examination showed tenderness in the lumbar paraspinal area (Tr. 1490). On November 28, 2009, Ms. Wells complained to PANT that her back hurt and she had been without medications for weeks (no longer prescribed by BACH) (Tr. 1490). The examination showed tenderness in the lumbar paraspinal area (Tr. 1490).

On November 30, 2009, Ms. Wells went to Vanderbilt University Medical Center's (VUMC's) Neurosurgery Spine clinic with the chief complaint of possible lumbar radiculopathy (Tr. 188-189). Five AP, lateral and flexion and extension lateral lumbar spine images showed mild or moderate narrowing of the L3-L4, L4-L5 and L5-S1 diskovertebral joints (Tr. 188). This was interpreted as mild disc bulges, no stenosis and no obvious nerve compression (Tr. 191). Yet, because of her low back pain, the provider "trialed her with a brace" and recommended more physical therapy and more epidural steroid injections (Tr. 191).

On December 9, 2009, following reports of low back pain that radiated to posterior right lower extremity, Ms. Wells had sensory and motor studies and an electromyographic (EMG) study of the lower extremities at VUMC which were essentially normal (though the study was somewhat limited by patient cooperation) (Tr. 186--188). The examination was notable only for pain-limited right knee flexion and extension, but there were borderline findings on the left peroneal motor study of uncertain clinical significance (Tr. 186, 188). The same day she had a lumbar epidural steroid injection at the L5-S1 level (Tr. 185).

On December 31, 2009, Ms. Wells visited BACH due to acute lower back pain and upper back pain under the shoulders which Ms. Wells rated as 7/10 on the pain scale (Tr. 428, 429). Ms. Wells report that she had a lumbar epidural steroid injection three weeks before which did improve her pain (Tr. 429). She described the pain being most severe in her "L upper back and neck area" (Tr. 429). The examination revealed tenderness, abnormal motion and pain elicited by motion in the cervical spine area (Tr. 430). The thoracic spine exhibited a spasm of the paraspinal muscles (Tr. 430). The thoracolumbar spine demonstrated tenderness on palpation and pain was elicited by motion (Tr. 431). The lumbosacral spine exhibited muscle spasms (Tr. 431). Ms. Wells was given an injection of Toradol 60 mg. (Tr. 431).

On January 14, 2010, Ms. Wells had tendon origin injections from L2-S1 at PANT complaining of pain in low back and neck (Tr. 754, 1623). She reported that walking and bending made her pain worse (Tr. 1625).

On January 22, 2010, Ms. Wells's MRI of the cervical spine showed degenerative

changes in the facet joints bilaterally (C2-3, C3-4, C4-5, C5-6). There was central and slight rightward bulging of the C4-5 disc and slight central bulging of the C6-7 disc and C7-T1 discs (Tr. 293).

On February 1, 2010, Ms. Wells got tendon origin injections from C2-C6 (Tr. 750).

On February 4, 2010, Ms. Wells reported her lower back pain was 6/10 on the pain scale and she asked for a refill on Motrin and Flexeril (Tr. 425). She reported she also took Tylenol (Tr. 425). The diagnosis was obesity and cervicalgia (Tr. 426). On February 11, 2010, Ms. Wells got tendon origin injections from C2-C7 at PANT (Tr. 744).

On February 17, 2010, Ms. Wells had a sensory conduction Study – Class III which had these findings suggesting pathology: Right (C2) ulnar nerve +2 moderate. Further, this test had findings suggesting irritation at Left (C2), greater occipital nerve – 1 hyper and Right (C7) radial nerve medial branch – 1 hyper (Tr. 785).

On March 8, 2010, at BACH it was noted: back pain was "10/10 totally disabling on the pain scale" (Tr. 416). This increased back pain had lasted four days after shopping (Tr. 416). She reported that the lower back pain was radiating and that her back had muscle spasms and it was noted that her lumbosacral spine exhibited muscle spasms (Tr. 417). The impression was lumbago (Tr. 417). She was prescribed a methylprednisolone dose pak, 4 mg tablets (Tr. 417). Ms. Wells asked for a referral to St. Thomas Back Clinic (Tr. 416).

On March 9, 2010, it was noted that Ms. Wells had asked for a referral to Howell-Allen Clinic for her back pain (Tr. 413). On March 10, 2010, Ms. Wells had tendon origin injections at levels that appear to say left and right (Tr. 735). On April 6, 2010, Ms. Wells had a tendon origin injection at an unknown level (possibly at the spinalis tendon in the lumbosacral area) (Tr. 732). She repeated her request to go to Howell-Allen Clinic (Tr. 730).

On April 20, 2010, Dr. Christopher Ashley of the Surgery Center of Clarksville gave Ms. Wells a lumbar epidural steroid injection under fluoroscopic guidance level right L5-S1 (Tr. 1718). The assessment was lumbar radiculitis, lumbar spondylosis, and sciatica (Tr. 1718).

On May 20, 2010, Ms. Wells had a tendon origin injection in the spinalis in the lumbosacral area (Tr. 723).

On May 24, 2010, Dr. Vaughan Allen reviewed the previous EMG and MRI (Tr. 1774). He noted she walked with a limp and got up and down from the examination table very slowly (Tr. 1774). She had spotty sensory loss of her right leg and stretch findings gave her back and hip pain (Tr. 1774). She had give away weakness of the right leg that he did not believe was reliable because Ms. Wells "can certainly walk on her leg" (Tr. 1774). Ms. Wells had subjective loss of range of motion of her low back but no palpable muscle spasm (Tr. 1774). His impression was lumbar strain superimposed upon underlying degenerative changes (Tr. 1774). On May 27, 2010, Dr. Vaughan Allen wrote a letter saying he had a hard job putting subjective

complaints together with his objective examination, stating he had ordered another EMG of her legs (Tr. 1771).

On June 22, 2010, Ms. Wells reported that she had fallen down her daughter's stairs in Alaska with her chief complaint to PANT being "my back hurts," and "left shoulder" and "hurt my right arm" (Tr. 715, 717). That day at BACH Ms. Wells had a right shoulder procedure which showed early spur formation in the undersurface of the distal end of the clavicle which may have caused impingement syndrome (Tr. 394--395). Pain was rated as 9/10 on the pain scale and it was noted that the right shoulder pain radiated (Tr. 397). During the review of systems, it was noted that Ms. Wells reported "Back pain increase in chronic pain. Seen by pain management for this." (Tr. 398). Her medicine was Ultram 1-2 tabs every eight hours and Flexeril 10 mg. daily as needed (Tr. 398). She also reported limb pain and constant pain in right shoulder/deltoid area which increased with activity and which interfered with sleep (Tr. 398). During the examination, the right shoulder was tender on palpation, motion was abnormal/limited abduction and pain was elicited on motion, during both the Neer impingement test and Hawkins-Kennedy impingement test (Tr. 398). The assessment was joint pain, localized in the shoulder, body mass index and obesity (Tr. 398). Ultram was increased to 50 mg. 2 tablets every four to eight hours (Tr. 398).

On July 2, 2010, after complaining of low back pain and leg pain Ms. Wells had motor and sensory nerve conduction studies and needle EMG on the right and left legs. It showed evidence of mild right sacral nerve root irritation at an unidentified level (Tr. 276—278). Dr. Allen interpreted this as normal (Tr. 1776).

On July 12, 2010, Dr. Vaughan Allen prescribed physical therapy and wrote a note saying that Ms. Wells would need to work under the following restrictions: Lifting no more than twenty pounds and no repetitive bending (Tr. 1768, 1772).

On July 20, 2010, during a visit to PANT, Ms. Wells reported that her back and right shoulder hurt and she reported she was using Flexeril and Ultram for pain, but the Ultram had not given her relief so she had switched back to Lortab because it helped her sleep, although it was not much help for relief of pain (Tr. 711). The examination showed tenderness at the cervical and lumbar paraspinals and decreased range of motion on the right and left and with bending (Tr. 711). The tendon point injections were deferred because they were not much help (Tr. 712). The Lortab 7.5 prescription was refilled.

On July 26, 2010, Ms. Wells returned to BACH, complaining of right shoulder and low back pain (Tr. 390). The pain was 8/10 on the pain scale (Tr. 391). The assessment was obesity, joint pain, localized in the shoulder and lumbar radiculopathy (Tr. 392). She was referred to physical therapy (Tr. 392). Another office note from the same day noted that Ms. Wells reported that the pain was not getting any better, she was calling to get radiology results, and that she was not taking the Lortab she had been prescribed (Tr. 394). The assessment by another provider that same day was arthralgias in multiple sites (Tr. 395).

On July 29, 2010, HealthNet approved three visits for injections/infusions which Dr. Lizabeth Smolenski of Surgery Center of Clarksville had requested for treatment of lumbosacral spondylosis without myelopathy and myalgia and myositis (Tr. 779—780).

On August 5, 2010, Ms. Wells complained to Surgery Center of Clarksville that she had right leg and right foot pain that was 6-7/10 on the pain scale (Tr. 1720). Dr. Damon Dozier gave her a lumbar epidural steroid injection under fluoroscopic guidance, level L5-S1 (Tr. 1723).

On August 11, 2010, at BACH, Ms. Wells complained of headache (5/10 on the pain scale) which began three days after she had had an epidural (Tr. 388). She also complained of Cspine pain (Tr. 388). At the time she had pain medication of Lortab and Morphine (Tr. 387). She was advised to increase physical activity as pain was well controlled by the epidurals that she was receiving (Tr. 388).

On August 16, 2010, Ms. Wells returned to Star Therapy for back physical therapy (Tr. 1403). Physical therapy for the shoulder began around September 27, 2010 (Tr. 1449).

On August 17, 2010, PANT increased MS Contin and Lortab (Tr.708).

On September 14, 2010, Ms. Wells complained of back and right shoulder pain, rating it 7/10 on the pain scale, worse with bending and walking for greater than thirty minutes (Tr. 701). She complained the medications were making her drowsy. She had tenderness on the cervical and lumbar paraspinal areas and right shoulder and decreased range of motion (Tr. 701). The MS Contin was decreased (Tr. 702).

On September 24, 2010, Ms. Wells went to BACH complaining of constant pain in her right shoulder since her fall in June 2010 (Tr. 368).

On September 29, 2010, Ms. Wells had an appointment at BACH to discuss her physical concerns with her pain medications (Tr. 361). "Generalized pain and feeling tired (fatigue)" was noted (Tr. 361).

On October 8, 2010, Ms. Wells complained of back pain of 9/10 on the pain scale during her examination at BACH to review lipids (Tr. 353).

On October 12, 2010, Ms. Wells returned to PANT, saying that her shoulder was a "10" on the pain scale (Tr. 699). MS Contin and Lortab were again prescribed (Tr. 698).

On October 18, 2010, Ms. Wells complained of chronic back pain during her gastroenterology appointment at BACH (Tr. 347). The impression was constipation, likely from chronic narcotics, and lumbar radiculopathy (Tr. 348).

On November 2, 2010, Ms. Wells went to BACH reporting that she had fallen down the stairs in June and had to grab the railing (Tr. 226). Ms. Wells reported right shoulder pain on the

pain scale of 9/10 (Tr. 343). X-rays of Ms. Well's right shoulder demonstrated some AC arthrosis and spurs. It also appeared that she had a small spur on her greater tuberosity. She had positive Spurling sign (Tr. 227). The impression was right shoulder impingement (Tr. 227).

On a November 2, 2010 visit to BACH the history of the present illness was noted:

Patient is a 50-year-old right-hand-dominant female who fell down the stairs in June and had to grab the railing. She had pain in the anterior aspect of her right shoulder. Previous to this, she has had significant neck and low back pain as well. She did begin physical therapy for her shoulder, but it made her worse so she stopped. She has not had any injections. It bothers her a lot with overhead activity and nighttime as well as reaching behind her back. She is currently taking morphine more for her back and neck but also for her shoulder as well as Motrin (Tr. 343).

It was also noted she was a painter but currently not working due to her chronic pain issues (Tr. 343). The musculoskeletal examination revealed:

Her right shoulder had 120 degrees of forward flexion actively and passively. She can internally rotate to her right hip. External rotation is to 45 degrees with her arm at her side. She had positive Neer and Hawkins tests. She is tender to palpation over her greater tuberosity and her biceps tendon. Rotator cuff strength is 4/5 for supraspinatus and infraspinatus secondary to pay. She is unable to do a belly press or lift-off test (Tr. 344).

The impression was right shoulder impingement (Tr. 344). The recommendation was to continue working on her range of motion because she was quite stiff. She did have a positive Spurling sign which created pain in her shoulder blade (Tr. 344).

On November 17, 2010, the PANT notes reveal that Ms. Wells was still complaining of back and right shoulder pain (shoulder pain rated a 10/10 and back pain reduced to 3/10 on the pain scale) (Tr. 693). She still had tenderness in the cervical and lumbar paraspinal areas and right shoulder and decreased range of motion (Tr. 693). Prescriptions to refill Lortab and MS Contin were given (Tr. 694).

On November 19, 2010, Ms. Wells had an MRI of the right shoulder. There was a degenerative change in the acromioclavicular joint and the lateral humeral head. There was a downward tilt and lateral beaking of the lateral acromion which predisposed Ms. Wells to rotator cuff injury. There was also increased signal intensity in the lateral rotator cuff. A linear area of increased signal intensity was felt to represent a partial tear of the interior surface of the rotator cuff. There was increased signal intensity seen in the possible biceps tendon. Fluid was seen about the proximal biceps tendon indicating tenosynovitis (Tr. 264).

On November 29, 2010, the Pain Associates of Tennessee notes reveal that Ms. Wells

was reporting shoulder pain of 9/10 on the pain scale worse when raising her arm, with low back pain of 5-6/10 on the pain scale (Tr. 677). She again has tenderness of the left paraspinal area and at the right shoulder and decreased range of motion of the right shoulder (Tr. 677). Mobic was added to her prescriptions (Tr. 678).

On December 7, 2010, Ms. Wells went to the emergency room of BACH complaining of chest pain and right shoulder pain (Tr. 210) and on December 15, 2010, Ms. Wells complained to
PANT about worsening shoulder pain (10 out of 10 on the pain scale) (Tr. 673, 685). She reported MS Contin was too sedating and that she thought she needed surgery (Tr. 685). She had tenderness in the left paraspinal and right shoulder and had decreased range of motion of the right shoulder (Tr. 685). Ms. Wells asked for her prescriptions to continue (Tr. 672).

On January 5, 2011, Ms. Wells returned to BACH, complaining of right shoulder pain (Tr. 310). She was injected with 60 mg. of Kenalog, 4 ml. of lidocaine, and 4 ml. Marcaine which eliminated some of her pain (Tr. 936). The MRI from November 2010 was reviewed and the impression was right shoulder impingement and right frozen shoulder (Tr. 312).

On January 12, 2011, Ms. Wells rated her pain for PANT (9/10 on the pain scale for the right shoulder and 6/10 for the lower back and right leg) (Tr. 670). She reported that she had had a steroid injection in her right shoulder from the orthopedic doctor at BACH and was evaluated for surgery (Tr. 667, 670). Ms. Wells had tendon origin injections from L2-L5 and/or in the triceps brachii area and/or possibly the C2-C8 (the writing is illegible) (Tr. 669, 1651). On February 9, 2011, the staff at PANT deferred any injections due to "poor response" (Tr. 1645).

On February 15, 2011, Ms. Wells went to the orthopedic clinic at BACH for an evaluation of her right shoulder (Tr. 928). Ms. Wells could actively and passively move her shoulder about 90 degrees (Tr. 930). The impression was right shoulder impingement and right frozen shoulder (Tr. 928). The examiner recommended physical therapy and a re-evaluation in two months (Tr. 928). On February 17, 2011, Ms. Wells had an MRI of the lumbar spine which showed decreased signal intensity in the L3-4, L4-5 and L5-S1 discs indicating desiccation and degenerative disc disease. There was broad-based bulging of L3-4 disc, mild broad-based bulging of the L4-5 disc and central bulging of the L5-S1 disc. The L3-4, L4-5 and L5-S1 all had degenerative changes in the facet joints bilaterally (Tr. 1035).

On February 21, 2011, a sensory conduction study – Class III was conducted at PANT (Tr. 1635). The findings which suggested irritation pathology were: Right (L5) peroneal nerve +1 mild and Right (S1) sural nerve +3 marked (Tr. 1635). No injection was given to Ms. Wells by the PANT on March 10, 2011 due to "poor response (Tr. 1631). On that date, Ms. Wells reported that "increased morphine helped a lot" (Tr. 1629). She asked for an epidural with Dr. Dozier to be set up (Tr. 1629).

On March 28, 2011, was the last physical therapy visit with Star Therapy for (Tr. 1403).

On March 30, 2011, Ms. Wells had a visit with the orthopedic clinic at BACH in which she rated her right shoulder pain as 7/10 on the pain scale (Tr. 917). She reported she had been doing her physical therapy, but felt like her shoulder had returned to its previous state of pain and
she did not feel she was getting any great gains in her motion (Tr. 917). The impression was right shoulder impingement and right frozen shoulder (Tr. 918). Ms. Wells was interested in surgery (Tr. 918). The examiner recommended physical therapy and a re-evaluation in two months (Tr. 918).

After the DLI of March 31, 2011:

At BACH on April 4, 2011, the examiner noted cervical spine tenderness on palpation and pain was elicited by motion and the lumbosacral spine exhibited muscle spasms (Tr. 912).

Ms. Wells changed her pain management provider on April 14, 2011 by starting treatment with Pain Management of Middle Tennessee. Dr. Dozier gave Ms. Wells a lumbar epidural steroid injection under fluoroscopic guidance, level L4-L5 on the right (Tr. 815). The record shows that Ms. Wells continued her treatment with Pain Management of Middle Tennessee for at least five more visits even after the date last insured (Tr. 1671—1710).

On April 18, 2011, Ms. Wells returned to Dr. Vaughan Allen of the Howell/Allen Clinic, still complaining of back and right leg pain to the foot and describing diffuse global sensory loss of her right leg (Tr. 1793). During the examination she was very slow, very deliberate and had a difficult time getting up and down on the examination table and significant loss in range of motion of her low back. Yet she had an absolutely intact neurologic exam and no muscle spasm (Tr. 840, 1793). Dr. Allen could not find any anatomic correlation with her symptoms (Tr. 840).

Also on April 18, 2011, Ms. Wells had a sensory nerve conduction study which showed sensory superficial peroneal neuropathy, mild, clinically not significant and sensory sural neuropathy, mild, clinically not significant (Tr. 1796).

Dr. Vaughan Allen reported that the EMG of her leg was normal (Tr. 1802). He did not have an explanation of Ms. Wells's symptoms and suggested she stay on a good chronic walking exercise program and proceed from there (Tr. 1802).

On May 11, 2011, at BACH Ms. Wells had surgery on her right shoulder: manipulation, right shoulder arthoscopic capsular release and subacromial decompression (Tr. 833). The surgery was indicated because extensive physical therapy did not provide relief (Tr. 833).

Around May 17, 2011, Ms. Wells started treatment with Center for Neurological Treatment and Research with Dr. Richard Rubinowicz and family nurse practitioner (FNP) George Shwab (Tr. 1053). The letter of May 17, 2011 provides a history of the treatment as well as the results of the neurological exam (Tr. 1053--1055). Ms. Wells ambulated with a cane and had an antalgic gait (Tr. 1054). There was some hesitation and difficulty with use of the right

and left lower extremities during exam maneuvers, but motor strength was 4 over 5 and equal bilateral lower extremities (Tr. 1054). She was able to heel and toe walk with great difficulty (Tr. 1055). The range of motion revealed significant pain with extension at 5 degrees and flexion at 15 degrees (Tr. 1055). She had diffuse tenderness of the lumbosacral region bilaterally, but no spinal process tenderness (Tr. 1055). The impression was, "History and physical examination are indicative of lumbar radiculopathy and known degenerative disk disease secondary to fall in May

of 2009 (Tr. 1055). Dr. Rubinowicz/FNP Shwab recommended Neurontin 300 mg. once a day, slowly titrating to Neurontin 300 mg. three times a day (Tr. 1055).

On May 25, 2011, Ms. Wells rated her pain as 7/10 in her mid-low back (Tr. 870).

On June 21, 2011, on behalf of the Disability Determination Section (DDS), Dr. Christopher Fletcher examined the medical reports that were in the file at that time and cited proof from these records: the August 2009 MRI, a November 2010 office visit, a March 10, 2011 office visit, a May 2, 2011 office visit and records from the May 18, 2011 right shoulder procedure (Tr. 1023). He opined that Ms. Wells could lift twenty pounds occasionally, ten pounds frequently, stand/walk six out of eight hours, sit about six hours a day and was limited in push/pulling to frequently in the right upper extremity (Tr. 1017). He further opined that Ms. Wells could occasionally climb ladder/rope/scaffolds could occasionally reach overhead with her right upper extremity and crawl and could frequently reach all other directions (Tr. 1018--1019).

On the July 12, 2011 return visit to Center for Neurological Treatment and Research (FNP) George Shwab noted Ms. Wells used Neurontin twice a day and she had antalgic gait and positive SLR pain on the right (Tr. 1052). He recommended a lumbar discogram (Tr. 1052).

On September 16, 2011, Dr. Frank Pennington, on behalf of DDS, examined the medical reports that were in the file at that time and cited proof from these records: Dr. Dozier's epidural steroid injection L4-5 on April 14, 2011, BACH office visit from April 18, 2011 and the May 18, 2011 BACH record showing the right shoulder procedure (Tr. 1026).

On September 20, 2011, FNP George Shwab noted: range of motion of the lumbar spine was 30 degrees with minimal pain, extension to 10 degrees with pain, minimal paraspinal muscle tenderness in the lumbosacral regional and positive bilateral SLR pain at 80 degrees (Tr. 1050). They reviewed a DVD from Walmart of her injury which showed "the slip without falling" (Tr. 1050). His assessment was: Thoracic or lumbosacral neuritis or radiculitis not otherwise specified and lumbar disc displacement without myelopathy (Tr. 1050). This note was edited and co-signed by Dr. Richard Rubinowicz (Tr. 1051).

On November 1, 2011, Ms. Wells returned to FNP George Shwab "complaining miserably of right leg pain" and with complaints of increased neck pain (Tr. 1048). He reviewed recent MRI's of the cervical spine and lumbar spine (Tr. 1048) (See Tr. 1263 for Dr. Taylor's interpretation of the lumbar MRI). She continued to have antalgic gait and used a cane (Tr. 1048). Reflexes were diminished, but symmetric in bilateral knees and ankles and the sensory

exam revealed diminished sharp/dull sensation in a nondermatomal fashion over the distal right lower extremity, and the neck had decreased range of motion (Tr. 1048). He added cervicalgia to his previous assessments (Tr. 1048).

On December 7, 2011, Dr. Randolph Taylor, Captain U.S. Army, Family Medicine Clinic, BACH, signed a physical capacity evaluation form that stated that Ms. Wells had multiple medical issues, mostly musculoskeletal which caused "overall impairment of working ability"(Tr. 1027). He opined that Ms. Wells could sit one hour a day and stand/walk zero hours per day (Tr.1027). She could only lift up to 10 pounds (Tr. 1027). He believed she had multiple pain locations to include shoulder, back, cervical and lumbar pain, right hand pain and bilateral sciatic (Tr. 1028). Dr. Taylor said the pain was severe and she would have three or more unscheduled absences per month and more than two unscheduled breaks during the day (Tr. 1028). (According to the vocational expert (VE), if this opinion is credited, there are no jobs that Ms. Wells could perform (Tr. 65).

On December 15, 2011, Ms. Wells had a provocative lumbar discography at L3-L4, L4-L5 approaching the left (Tr. 1732--1733). A CT of the lumbar spine post L3-4 discography showed intradiscal contrast (Tr. 1037). There was a grade 5 annular tear posterolaterally on the right with extravasation of contrast into the posterolateral aspect confined by a large marginal osteophyte arising from the inferior endplate of L4. Contrast extends into approximately ¾ of the annulus circumferentially (Tr. 1037). There was disk space narrowing there (Tr. 1037).

On December 30, 2011, FNP George Shwab again examined Ms. Wells and he reviewed the results of the diskogram (Tr. 1047). The deep tendon reflexes were diminished but equal bilaterally (Tr. 1045). Sensory exam revealed scattered nondermatomal losses of sharp/dull perception and positive SLR pain and pain worse with lumbar flexion at 40 degrees (Tr. 1045). The diagnosis was lumbar disc displacement without myelopathy (Tr. 1045). This note was edited and co-signed by Dr. Richard Rubinowicz (Tr. 1047).

On January 31, 2012, FNP George Shwab again examined Ms. Wells and found an antalgic gait, positive bilateral SLR pain, slightly reduced motor strength in the lower extremities and increased pain in lumbar spine with extension at 20 degrees and significant pain with flexion at 30 degrees (Tr. 1042). Sensory exam revealed scattered nondermatomal deficits with sharp/dull perception in the distal lower extremities (Tr. 1042).

On February 20, 2012, FNP George Shwab filled out a physical capacity assessment which revealed his opinion that Ms. Wells could sit for two hours a day, and stand for one hour day and walk one hour a day and that she would be expected to have three or more unscheduled absences per month due to health-related reasons and would be expected to take more than two unscheduled breaks during the work day (Tr. 1030-1031) (According to the VE, if this opinion is credited, there are no jobs that Ms. Wells could perform (Tr. 65).

On May 3, 2012, Ms. Wells returned to Dr. S. Periyanayagam. The doctor noted that Ms. Wells appeared to be in distress and walked with a limp, favoring the right leg. Her back

movements were slightly restricted and painful. Flexion extension was about 70 degrees and lateral flexion was 15 degrees and the SLR test was positive on the right side about 50 degrees. The impression was bulging disc at L5-S1 level, right causing lumbar radiculopathy, right and degenerative lumbar disc disease (Tr. 1275). She was advised to have a lumbar laminectomy and discectomy at L5-S1 level if she persisted in having symptoms (Tr. 1275).

On May 31, 2012, two views of the lumbar spine showed mild disk space narrowing at the L5-S1 level and mild facet degenerative changes at the L4-5 and L5-S1 levels (Tr. 1282).

On June 8, 2012, Ms. Wells consulted Dr. S. Periyanayagam again to discuss surgery, but he wanted to wait until the Walmart trial was over (scheduled for July 2012) (Tr. 1273).

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d

506, 509 (6th Cir. 2007); <u>Garner v. Heckler</u>, 745 F.2d 383, 387 (6th Cir. 1984).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).  Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff's primary argument is that the ALJ erred in finding that her testimony was not fully credible, and so failed to appropriately determine her RFC in light of her pain-related loss of function.  The ALJ's enumerated finding that "[t]he claimant's

subjective complaints, including pain, have been evaluated as required under the applicable regulations and rulings" (Tr. 21), and the narrative analysis that follows, evokes the rubric established in 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p. (Tr. 20-21) Under that rubric, upon finding "a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms," the ALJ is required to then evaluate the intensity and persistence of those symptoms by reference to the record as a whole, including both the objective medical evidence and other evidence bearing on the severity of the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(1)-(3). There is no question that a claimant's subjective complaints can support a finding of disability if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record. Id.; see, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); SSR 96-7p, 1996 WL 374186, at *1, 5 (describing the scope of the analysis as including "the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record[;]" "a finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled."). Such "other evidence" which the ALJ is bound to consider includes evidence of the following factors:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or
> other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication

you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). This regulation, at subsection (4), further provides as follows:

In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).

Here, after reciting the above standard governing his consideration of plaintiff's credibility, the ALJ found as follows:

The claimant attributed her back and leg pain (and at times, her shoulder and neck pain) to a fall at Walmart. However, the emergency room treatment notes show that she did not actually fall, and she only reported leg and hip pain, not back pain. A week later, she asked for pain medication for a trip to Disney World. She also managed to travel to Virginia to sell her deceased mother-in-law's house and to Alaska, to help care for a new

grandchild. She told at least two specialists that she had no history of back pain prior to May 2009, but emergency room records from 2003 and 2005 show that she was seen on at least two occasions for low back pain. Objective testing has revealed relatively minor findings involving her back, and normal EMG and nerve conduction studies which showed no evidence of neuropathy or radiculopathy (and limited cooperation of the claimant in December 2009). Treating specialist Allen stated in July 2010 that he had no good explanation for the claimant's symptoms based on her studies and examination. She reported that her shoulder and neck pain began in January 2010 because of her work as a painter, but later attributed it to a fall on the stairs in June 2010. Surgery performed after the date last insured on the shoulder [was] for an impingement syndrome and adhesive capsulitis, rather than for a torn rotator cuff. Her testimony as to a recent diagnosis of carpal tunnel syndrome is irrelevant to the period in question. Her credibility as to work is also suspect: she reported working as a painter until the onset date, but had only a few hundred dollars reported earnings in 2007 and none thereafter. She told her pain management provider that she was working in January 2010. Her function report at exhibit 3E, completed in January 2011 stated that she was able to clean house one room at a time, cook, do laundry, iron, and manage her money. She testified at the hearing that she still cooked and kept house, although her husband said that she was not doing it as well as in the past. Her primary care provider, Nurse Practitioner Currey, refused to provide an excuse for her to be out of work in December 2009, because she did not feel the claimant needed to be off work because of back pain. Thus, in sum, in consideration of all factors including the diagnostic test results, [and] the treatment notes of her physician providers, the claimant's subjective complaints are not persuasive to the extent alleged.

(Tr. 21)

Plaintiff concedes that she has made some inconsistent statements, but asserts that the ALJ wrongly viewed as undermining her credibility: (1) her request for a note saying she cannot work; (2) the confusion over whether she fell or merely slipped when she sustained her injury; (3) her immediate reports of only lower extremity pain from the slip at Walmart, followed days later by her complaints of lower back pain; (4) her ability to take

trips; and (5) her failure to report brief and isolated incidents of significant back pain in 2003 and 2005 to the specialists she saw in connection with her 2009 injury, when describing her past medical history as not including any prior back pain.  Plaintiff argues that these items should either have weighed in her favor, or that they are relatively picayune demerits when compared to the lengthy record of her search for medical treatment to relieve her pain, which should have persuaded the ALJ that her complaints were credible.

While the ALJ agreed that plaintiff's pain complaints were credible to the extent that she was limited to a range  of light work, consistent with the opinions of the nonexamining state agency physicians and Dr. Allen, it is clear that the ALJ doubted her candor as a witness due to the inconsistencies between her testimony and her work record, and based on certain reports from treating sources who appeared to disbelieve plaintiff's report of pain because it was out of proportion to the objective medical data.  Such a weighing of credibility is firmly within the ALJ's province, and is due significant deference on judicial review.  See, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997).  Moreover, the courts have recognized that "[d]iscounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  Id.  As in Walters, the medical evidence in this case "is not consistent and is capable of supporting more than one reasonable conclusion."  Id. at 532.  It is true that, since the date of her injury in May 2009, plaintiff has sought relief of her symptoms from multiple medical sources including her regular care providers, consulting neurologists, and pain management physicians, and has been consistently prescribed multiple forms of symptomatic treatment, including, e.g., narcotic and other oral

medications; physical therapy and home exercise; and epidural and trigger point injections. It is also true that the objective medical data collected during plaintiff's insured period -- including multiple MRIs, EMGs, and other diagnostic tests as well as physical examination results -- did not corroborate plaintiff's subjective report of severe symptoms and resulting limitations. Of particular significance to the ALJ were the multiple notations from consulting neurologist Dr. Vaughn Allen (Tr. 1773-74, 1771, 1776, 1793) describing the disconnect between benign objective measurements (including MRIs that showed degenerative changes and disc bulges but no acute injury (Tr. 1773, 1793), normal results on EMG testing of her extremities (Tr. 1776), and an "absolutely intact neurologic exam" (Tr. 1793)), and serious subjective complaints of pain, loss of range of motion, and right leg weakness and sensory loss, leading Dr. Allen to proclaim that he "simply [did] not find any anatomic correlation with her symptoms." (Tr. 1793) This last note of treatment from Dr. Allen is dated April 18, 2011, less than three weeks after plaintiff's date last insured for benefits. Id. In the absence of any contrary medical opinion as to plaintiff's condition during her period of insurance,[2] and in light of the additional factors highlighted by the ALJ as well as plaintiff's record of conservative (albeit consistent) treatment that managed her pain well enough to allow for a few trips out of state and the other activities referenced in the ALJ's opinion above, it is clear to the undersigned that substantial evidence supports this

---

[2]The only assessments to the contrary were rendered after plaintiff's date last insured, as discussed infra. As noted by the ALJ, in December 2009, plaintiff's primary care provider, Nurse Practitioner Currey, wrote in response to plaintiff's request for a work excuse: "The note to be out of work will need to come from those who are managing her pain - the pain management office. I will not provide a note stating she needs to be out of work as I do not feel she needs to be out of work for her back pain." (Tr. 435) The opinions of Dr. Allen and the nonexamining state agency consultants (Tr. 1016-26) support the finding of an RFC for a reduced range of light work during the relevant period, as found by the ALJ.

determination of plaintiff's credibility and RFC, to which the Court should defer.

Although the ALJ did not pay much heed to the medical records that were generated in the year following plaintiff's date last insured, viewing them as having little value to the determination of plaintiff's level of impairment while insured for benefits, plaintiff argues that further diagnostic test results obtained in December 2011 lend credence to her subjective complaints during the insured period, and to the assessments of disabling limitations by Dr. Randolph Taylor and Nurse Practitioner George Schwab, rendered well after her date last insured. However, the assessments of Dr. Taylor and Mr. Schwab do not purport to consider plaintiff's condition prior to March 31, 2011, nor did those providers have any significant treatment relationship with plaintiff prior to that date.

In any event, it appears from a review of the objective test results which postdate plaintiff's insured period that her condition significantly worsened in the months following March of 2011.[3] Lumbar spine MRI results obtained on August 17, 2009 (Tr. 303-04) and February 17, 2011 (Tr. 1791-92) showed the same degenerative changes and disc bulges, with no stenosis of the spinal canal or neural foramina; the radiologist in 2011 specifically noted no change in comparison to the 2009 study. (Tr. 1792) Then, six months after plaintiff's date last insured, the lumbar spine MRI of October 7, 2011 showed rightward and leftward bulging of the lumbar discs and noted that "[d]isc material is seen extending into the lateral recess at [the L5-S1] level on the left." (Tr. 1033) On November 1, 2011, Mr. Schwab noted these MRI results indicating disc rupture and recommended

---

[3]Though speculative, it is perhaps noteworthy, as a possible cause of her aggravated back impairment, that plaintiff has a history of tripping and falling that was noted in May 2011 by Mr. Schwab (Tr. 1053) and testified to by plaintiff at her hearing (Tr. 43-44, 58).

"lumbar discogram to validate locations of pain generators in her lumbar spine." (Tr. 1049) That discogram and the followup CT scan, performed on December 15, 2011, showed a grade 5 tear in the disc annulus between the third and fourth lumbar vertebrae (Tr. 1814) and concordance of pain complaints when pressure was applied to the L4-5 disc space with extravasation of dye into the epidural space. (Tr. 1812) With the benefit of these studies, Dr. Allen considered surgical intervention in his last recorded consultation with plaintiff, on January 16, 2012, but decided after consulting with other colleagues that surgery would not be of benefit to plaintiff in view of her multi-level disease, and would possibly increase her difficulty in the future. (Tr. 1824) Plaintiff thereafter sought additional opinions on the possibility of back surgery, but did not have anything scheduled at the time of the hearing. Although plaintiff has consistently complained of symptoms in her low back and right leg since her slip in May 2009, it is clear that her difficulty with symptom management became worse following her date last insured, as the proof shows that prior to that time she did not need an assistive device to walk (Tr. 46-47), but thereafter she came to require the use of a cane, a walker, and ultimately a rolling walker.

"Evidence of disability obtained after the expiration of insured status is generally of little probative value," <u>Strong v. Soc. Sec. Admn.</u>, 88 Fed. Appx. 841, 845 (6th Cir. Feb. 3, 2004), bearing relevance to the disability determination only where the evidence relates back to the claimant's limitations prior to the date last insured. <u>See</u> <u>Higgs v. Bowen</u>, 880 F.2d 860, 863 (6th Cir. 1988). As discussed above, the evidence here which postdates plaintiff's insured period is, as in <u>Higgs</u>, only minimally probative of her condition prior to March 31, 2011. Therefore, the ALJ gave such consideration to this evidence as was due, and did not err in failing to factor it into his consideration of plaintiff's credibility.

Plaintiff next argues that the December 7, 2011 assessment of Dr. Taylor should have been given controlling weight, but as discussed above and in the ALJ's decision, and as plaintiff concedes (Docket Entry No. 10 at 23), Dr. Taylor did not treat the impairments which plaintiff claims to be disabling during the insured period, nor does he appear to have had sufficient interaction with plaintiff during any period to be entitled to "treating source" status and the deference such status conveys. Plaintiff cites three visits to Dr. Taylor related to her back pain between September 2011 and December 2012. Id. at 23-24. This treatment relationship is plainly insufficient to entitle any opinion of Dr. Taylor's to controlling weight under 20 C.F.R. § 404.1527(c)(2). See Daniels v. Comm'r of Soc. Sec., 152 Fed. Appx. 485, 490-91 (6th Cir. Oct. 24, 2005) ("A physician who has treated a patient only a few times may be considered a treating source if that frequency of visits is appropriate for the claimant's medical condition. ... Daniels's two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions.").

Plaintiff next argues that the ALJ's determination of plaintiff's RFC obviously did not adequately account for limitations related to her right shoulder impairment, inasmuch as that impairment required surgery on May 18, 2011, after the date last insured. However, the ALJ recounted the history of plaintiff's shoulder impairment, from her reported injury in June 2010, to the diagnosis of impingement syndrome in November 2010, to the successful surgery in May 2011. (Tr. 19) Prior to the surgery, plaintiff had reported some relief of her shoulder pain with a steroid injection in January 2011 (Tr. 19, 937), and following the decompression surgery, plaintiff was reported to be very pleased with the

surgical outcome (Tr. 1072) and was released from physical therapy upon meeting the goals related to the shoulder.  (Tr. 1079)  In view of the limited time frame within the relevant period during which plaintiff reported significant shoulder pain and limitations, and the surgical correction of the impairment less than a year after the first report of injury, the undersigned finds that the ALJ adequately accounted for the resulting functional loss when he found that, during the relevant period, she was limited to no more than frequent pushing, pulling, and reaching -- and no more than occasional overhead reaching -- with the right upper extremity.  (Tr. 17)

Finally, plaintiff argues that restriction against repetitive bending contained in the "work statement" provided by Dr. Allen in July 2010 (Tr. 1772) should have been included in the ALJ's finding of her RFC.  However, while such restriction was not included as such in the RFC finding or in the hypothetical question posed to the vocational expert, the ALJ did include a limitation on both fronts to "frequently but not constantly perform[ing] other postural activities" which would include stooping or bending at the waist.  (Tr. 17, 60)  The Dictionary of Occupational Titles (DOT) defines "constantly" and "repetitively" in the same way:  as requiring performance of the activity for two-thirds of the workday or more; "frequently" is defined in DOT as requiring performance of the work activity for between one-third and two-thirds of the workday.  See Creech v. UNUM Life Ins. Co. of North America, 162 Fed. Appx. 445, 451 n.10 (6th Cir. Jan. 9, 2006).  Accordingly, the undersigned concludes that the restriction against repetitive bending was implicit in the ALJ's finding of plaintiff's RFC.  In any event, the undersigned agrees with the government that any such error in failing to explicitly include the restriction was harmless, as repetitive bending at the waist is not a job requirement of plaintiff's past relevant work as such work

is defined in the DOT, the resource with which the vocational expert's testimony was explicitly aligned.  (Tr. 62-63)

In sum, leaving the resolution of conflicts in the evidence and questions of credibility to the ALJ as required, <u>Bass v. McMahon</u>, 499 F.3d 506, 509 (6th Cir. 2007), the undersigned finds that substantial evidence on the record as a whole supports the ALJ's decision in this case.  That decision should therefore be affirmed.


## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).


**ENTERED** this 24th day of August, 2015.


  s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE